In The

*Court of Appeals*

*Ninth District of Texas at Beaumont*

_____

**NO. 09-19-00324-CV**
_____

**IN THE INTEREST OF P.M.**

**On Appeal from the 418th District Court**
**Montgomery County, Texas**
**Trial Cause No. 18-09-11763-CV**

**MEMORANDUM OPINION**

After a bench trial, Appellants Mother and Father appeal from an order

terminating their parental rights to their one-year-old daughter, P.M.[1] The trial court

entered an order terminating their parental rights and found clear and convincing

evidence under section 161.001(b)(1)(D) and (b)(1)(E) of the Family Code, and also

found termination was in the best interest of P.M. In their joint brief, Father and

Mother each raise two issues, challenging the sufficiency of the evidence supporting

---

[1] To protect the identity of the minor, we use initials to refer to the child and
pseudonyms for her mother and father. *See* Tex. R. App. P. 9.8(b)(2).

1

the trial court's termination of their respective parental rights under Family Code sections 161.001(b)(1)(D), and (E). We affirm the trial court's judgment.

Background

In September 2018, when P.M. was two months old, the Department of Family and Protective Services (the Department) filed an Original Petition to terminate the parental rights of Mother and Father. The trial took place on August 28, 2019.

Evidence at Trial

Brenda Lara, the CPS caseworker for P.M., testified that P.M. came into the Department's care when she was about two months old and was about a year old at the time of trial. Lara testified that P.M. came into the Department's care after allegations of domestic violence in the home between Mother and Father, and law enforcement was involved. Lara testified that, according to the affidavit in support of P.M.'s removal that she reviewed, there were also concerns about the safety of the condition of the home, and there was broken glass on the floor and a damaged or unsafe wall. Lara explained that the records she reviewed also indicated that, before the Department got involved, Mother drove under the influence of alcohol with P.M. in the vehicle on two occasions. Lara testified that she had been informed that Mother had four other children, that two were raised by her mother in Mexico and two were with their fathers, but that Mother had not told Lara why she did not have

2

custody of the other four children. Father's signed Acknowledgement of Paternity was admitted into evidence. Lara testified that P.M. was moved from her initial placement in a foster home to a "more permanent home[,]" the adoptive foster home where she is currently placed. According to Lara, P.M. is in a safe and "very healthy place[,]" P.M. is "very bonded" to her foster parents, and the foster parents intend to adopt P.M. if she is available for adoption.

Lara testified that there was domestic violence that predated the Department's involvement and there was a protective order issued against Mother relating to family violence against the Father. Lara also testified that according to the records she reviewed, on April 21, 2018, law enforcement was called out to Mother's and Father's residence regarding a disturbance between the two. According to Lara, on August 5, 2018, law enforcement was again called out to the home, and law enforcement observed Mother leave P.M. and another child unattended at the house while she "headed over towards the corner store located approximately a mile away[.]" Lara testified that when P.M. was less than two months old, an emergency protective order related to a family violence incident was issued on August 8, 2018 against Mother at Father's request. Lara testified that the protective order was a result of law enforcement being called out to Mother's and Father's residence on August 7, 2018, and law enforcement observed wounds to Father after Mother

3

assaulted Father. Lara testified that the family violence protective order prohibited Mother from committing family violence or stalking, communicating in a threatening or harassing manner, and going within two hundred yards of certain addresses. Lara testified that Mother had since been charged with violating the protective order. Lara testified that on January 13, 2019, law enforcement responded to a disturbance at Mother's and Father's home when they argued inside their garage. According to Lara, on January 27, 2019, law enforcement responded to a family disturbance at the house between Mother and Father, and Mother had been drinking. Lara testified law enforcement responded on January 28, 2019, to another family disturbance at the home and alcohol was a factor. Lara testified that she also pulled records from the Sheriff's office, which indicated that the Sheriff's office was involved as recently as May 2019, when Mother and Father had another verbal altercation in the home. Copies of the Montgomery County Sheriff's Office records and a protective order were admitted into evidence.

Lara testified that Mother and Father were at the October 30, 2018 hearing when the trial court ordered them to comply with the family service plans that were filed with the court on October 24, 2018. Mother's and Father's family service plans were admitted into evidence. Lara agreed that Mother had a family service plan that required Mother to submit to random drug testing and Mother did "most of them[,]"

4

but there were a lot of positives throughout the case. Lara testified that Mother and Father started complying with services required under their plans after March 2019, but they were still using cocaine, and Lara agreed that P.M. was in the Department's custody for at least six months before Mother and Father "started to become engaged at all in services[.]" Mother and Father were "unsuccessfully discharged" by their first outpatient treatment counselor because "[t]here [were] a couple times that they didn't show up[.]"

According to Lara, Mother and Father submitted to drug and alcohol testing during the case, and copies of the drug test results were admitted into evidence. Although some of those tests were negative, Lara's main concern until May of 2019 was that Mother and Father continued to test positive for cocaine, and Mother was pregnant and still testing positive for cocaine. Lara testified that, despite the trial court judge's warnings to Mother and Father at hearings during the pendency of the case that their parental rights could be terminated or restricted if they continued to abuse drugs, Mother and Father continued to test positive for drugs. Mother and Father also were supposed to attend AA meetings after they completed outpatient treatment because "they continue[d] to test positive still up until April and June[.]" At the time of trial, Lara had not confirmed whether they attended the AA meetings, and they had not provided proof to Lara that they were attending. Lara testified that

5

Mother's and Father's failure to make ongoing efforts to remain sober could directly affect P.M.'s safety. According to Lara, as of the permanency hearing in June 2019, Mother and Father were "partially compliant" and had not completed services.

Lara testified that, although Mother "tested positive on both UAs and hair follicles[,]" Mother initially denied her drug use and said it was impossible for the drug test to be positive because she had not used cocaine in the past two years. Lara testified that Mother's due date was in October 2019, and that in April 2019 Mother tested positive for cocaine in her urine, indicating she knowingly used drugs while pregnant and put the health of her unborn baby at risk.

Lara testified that initially Mother did not follow the recommendations of her service providers, but eventually she did. Ultimately, Mother completed all the recommended requirements of her service plan, including attending a parent collaboration meeting and completing a psychological evaluation, a substance abuse assessment, individual therapy, and anger management. Lara testified that Mother's account to her counselor of why CPS became involved did not match the police report because, although she reported to the counselor that police were called to the residence because she and Father were arguing, she did not report there was any physical violence and she described the conflict as normal. She initially denied to her therapist using drugs but later admitted she tried cocaine while she was out with

6

friends at a party. She told her therapist that drugs were not a part of her life and her children were not in danger. Lara agreed that Mother and Father were "essentially checking off the boxes of the service plan rather than making real changes[.]"

According to Lara, Mother was on probation for violating the protective order, the probation was modified due to her non-compliance, and that if Mother continued her noncompliance she risked going to jail. Lara testified that she believed Mother did not modify her behavior in order to have P.M. returned, but instead Mother was motivated to modify her behavior when she became "under threat from the criminal court system." Lara expressed her belief that if the criminal threat went away Mother would continue using cocaine. Lara explained that during the visits of Mother with P.M., Lara observed that P.M. did not seem comfortable with Mother or want Mother to hold her, Mother would not really interact with P.M. and watched Father play with P.M., and it concerned Lara that Mother showed a lack of parenting abilities and initially "spent more time on her phone than she did with the child."

Lara testified that, in response to the positive drug test results, Father did not deny using drugs and said, "it is what it is." Lara testified that in April 2019, Father tested positive for cocaine on a urinalysis and the level indicated recent use because cocaine is present in urine "three days or less." According to Lara, a hair follicle specimen for Father was collected on June 11, 2019, and the hair follicle test goes

back "[n]inety days[,]" and again he tested positive for cocaine. Lara testified that she does not believe Father has made any kind of life changes.

Lara testified that the incident when Mother left P.M. at home without an adult concerned Lara regarding Mother's ability to protect P.M. Lara also testified that she viewed a video that concerned her and appeared to be recorded by Mother in the last year while she was driving, and her one- or two-year-old son was unrestrained in the front seat of the truck. Lara agreed that the pattern of Mother's and Father's verbal altercations continued throughout the case and Lara believed it showed a pattern of failing or unwillingness to protect P.M. when P.M. was too young to protect herself. Lara testified that she was also concerned about Mother's arrest for public intoxication in October 2018 for alcohol, therapy notes from Mother's therapist indicating Mother did not want to talk to the therapist and denied having a drug problem, and Mother's consistent denial of drug use to Lara despite testing positive for drugs. According to Lara, Mother's denial of having a drug problem showed that she was not willing to get help or change her behavior, all of which would be a concern if P.M. is returned to Mother's care. Lara also had concerns because of Mother's parenting track record, which indicated that Mother did not have custody of her other four children.

Lara testified that Mother and Father argue with each other and in the beginning Mother and Father argued in front of Lara and the baby, and Lara had to ask Mother and Father to leave. Lara was concerned that in the couple of months prior to trial "[t]here [were] still call outs to [Mother's and Father's] home" for disturbances. Lara testified that she believed the incidents reflected in the documents from the Sheriff's office put P.M. in danger, that those conditions and surroundings could have significantly injured her, and the choices the parents made and continue to make endanger P.M. According to Lara, it would significantly impair P.M.'s physical health or emotional welfare if either Mother or Father had managing conservatorship of P.M. because P.M. had been with other caregivers since she was two and if she was to go back to her parents, Lara was concerned that "they will continue to use drugs, that they will continue with the domestic violence, [and] that their relationship is not stable."

The Court Appointed Special Advocate (CASA) testified that she has been the guardian ad litem for P.M. throughout the case and had observed visitations between P.M. and the parents and P.M. and the foster family. According to the CASA, during the visitations Mother would engage with P.M. "but not as much as I would have liked her [to], or would have liked to see." The CASA testified that Mother and Father missed at least three visits with P.M. at the beginning of the case.

9

The CASA explained that she agrees with the Department's recommendation that Father's and Mother's parental rights to P.M. should be terminated. According to the CASA, termination of parental rights was in P.M.'s best interests because of Mother's and Father's "constant drug issues [and] domestic violence[,]" which compromise P.M.'s physical safety and ability to thrive in a safe and stable environment. The CASA agreed with Lara that Mother and Father were just "checking the boxes, not making real changes[,]" and the CASA testified that "we haven't seen any progress." The CASA testified that she was concerned about Mother's and Father's most recent positive drug tests in June. The CASA was concerned that any improvement could have been because of the threat of criminal proceedings. The CASA agreed that, based on a couple of brief conversations with Mother and Father, the CASA was concerned with their "lack of awareness of their wrongdoings involving drug use . . . [b]ecause they're not realizing that it's a pretty big issue." The CASA testified that she believed the patterns of domestic violence and drug use would continue if P.M. was placed back in the home if there was no oversight by CPS, and that even with CPS oversight, she would still be concerned based on Mother's and Father's behavior throughout this case. The CASA testified that, based on her knowledge of the case and Mother's behavior, Mother "won't be able to fully take care of [P.M.] because [Mother is] on probation, and depending on

10

what they make her do or have her do." The CASA explained that P.M. has bonded with her foster parents, that she did not see that bonding between P.M. and her Mother or Father, and the CASA believed it was in P.M.'s best interest to be adopted by the foster family.

Mother did not testify. Father testified that he builds houses and that at the time the police intervened in August 2018 he was renovating their home. According to Father, Lara was assigned as the caseworker in November and that is when he and Mother received their service plans. Father admitted to using cocaine several times throughout the case but denied drinking or ever having drugs or alcohol in the home. Father testified that he did not use drugs with Mother, and he did not know she was using cocaine until the drug tests. Father denied that when police were called in August that he had fresh wounds on his body. According to Father, he and Mother were arguing but not physically fighting, and the scratches on him were from his work. Father testified that he believed that police were called so often to their residence because they live in a small house and the neighbors can hear them arguing and maybe screaming. Father testified that they "care about [P.M.] a lot[,]" he always protects her, and that on the day P.M. was removed from the home, Mother had not put P.M. in danger and P.M. was "perfectly safe[.]" Father explained that on that day, they were about to leave, P.M. was in her car seat inside the house, and Mother

11

and Father were arguing in the garage. Father admitted that he was concerned that Mother was using cocaine while pregnant and responded, "but it's something we [are] already working on and [to] be clean and be safe for her baby."

Standard of Review and Applicable Law

The decision to terminate parental rights must be supported by clear and convincing evidence, that is, "the measure or degree of proof that will produce in the mind of the trier of fact a firm belief or conviction as to the truth of the allegations sought to be established." Tex. Fam. Code Ann. § 101.007; *In re J.L.*, 163 S.W.3d 79, 84 (Tex. 2005). The movant must show that the parent committed one or more predicate acts or omissions and that termination is in the child's best interest. *See* Tex. Fam. Code Ann. § 161.001(b); *In re J.L.*, 163 S.W.3d at 84.

In reviewing the legal sufficiency of the evidence in a parental rights termination case, we must consider all the evidence in the light most favorable to the finding to determine whether a reasonable factfinder could have formed a firm belief or conviction that the finding was true. *In re J.O.A.*, 283 S.W.3d 336, 344-45 (Tex. 2009) (citing *In re J.F.C.*, 96 S.W.3d 256, 266 (Tex. 2002)). We assume the factfinder resolved disputed facts in favor of its finding if a reasonable factfinder could do so, and we disregard all evidence that a reasonable factfinder could have disbelieved. *Id.* In a factual sufficiency review, an appellate court must weigh

12

whether the disputed evidence is such that a reasonable factfinder could not have resolved it in favor of the finding. *In re A.C.*, 560 S.W.3d 624, 631 (Tex. 2018). We give due consideration to evidence the factfinder could reasonably find clear and convincing. *In re J.F.C.*, 96 S.W.3d at 266. Considering the entire record, if the disputed evidence is so significant that a reasonable factfinder could not have reasonably formed a firm belief or conviction, the evidence is factually insufficient. *In re J.O.A.*, 283 S.W.3d at 345 (citing *In re J.F.C.*, 96 S.W.3d at 266).

Only one predicate finding under section 161.001(b)(1) is necessary to support a judgment of termination when there is also a finding that termination is in the child's best interest. *See In re A.V.*, 113 S.W.3d 355, 362 (Tex. 2003) (applying previous version of the statute). Generally, we will affirm the termination order if the evidence sufficiently establishes any statutory ground that the trial court relied on in terminating parental rights as well as the best interest finding. *See id.* However, due process requires a heightened standard of review of a trial court's finding under subsections 161.001(b)(1)(D) or (E), even when another ground is sufficient for termination, because of the potential consequences for parental rights to a different child. *See In re N.G.*, 577 S.W.3d 230, 235 (Tex. 2019). Because subsection 161.001(b)(1)(M) alone provides a sufficient basis to terminate parental rights based on a previous subsection 161.001(b)(1)(D) or (E) finding, due process concerns, and

the requirement for a meaningful appeal require that, if a court of appeals affirms the termination on either of these grounds, it must provide the details of its analysis. *Id.* at 234-37. (citing U.S. Const. Amend. XIV, § 1; Tex. Const. art. I, § 19; *In re S.K.A.*, 236 S.W.3d 875, 890 (Tex. App.—Texarkana 2007, pet. denied)).

Under subsection D, parental rights may be terminated if clear and convincing evidence supports that the parent "knowingly placed or knowingly allowed the child to remain in conditions or surroundings which endanger the physical or emotional well-being of the child[.]" Tex. Fam. Code Ann. § 161.001(b)(1)(D). Subsection E allows for termination of parental rights if clear and convincing evidence supports that the parent "engaged in conduct or knowingly placed the child with persons who engaged in conduct which endangers the physical or emotional well-being of the child[.]" *Id.* § 161.001(b)(1)(E).

Under subsection D, parental rights may be terminated based on a single act or omission by the parent. *In re L.E.S.*, 471 S.W.3d 915, 925 (Tex. App.—Texarkana 2015, no pet.) (citing *In re A.B.*, 125 S.W.3d 769, 776 (Tex. App.—Texarkana 2003, pet. denied)). Termination under subsection E requires more than a single act or omission and a "'voluntary, deliberate, and conscious course of conduct by the parent is required.'" *Id.* at 923 (quoting *Perez v. Tex. Dep't of Protective & Regulatory Servs.*, 148 S.W.3d 427, 436 (Tex. App.—El Paso 2004, no pet.)). We

14

examine the time before the child's removal to determine whether the environment of the home posed a danger to the child's physical or emotional well-being. *Id.* at 925 (citing *In re L.C.*, 145 S.W.3d 790, 795 (Tex. App.—Texarkana 2004, no pet.)). "'A child is endangered when the environment creates a potential for danger that the parent is aware of, but disregards.'" *Id.* (quoting *In re N.B.*, No. 06-12-00007-CV, 2012 Tex. App. LEXIS 3587, at **22-23 (Tex. App.—Texarkana May 8, 2012, no pet.) (mem. op.)). The child does not have to suffer actual injury; it is enough that the child's well-being has been placed in jeopardy or the child has been exposed to loss or injury. *In re C.L.C.*, 119 S.W.3d 382, 392 (Tex. App.—Tyler 2003, no pet.). Generally, subjecting a child to a life of uncertainty and instability endangers the child's physical and emotional well-being. *See In re R.W.*, 129 S.W.3d 732, 739 (Tex. App.—Fort Worth 2004, pet. denied). Abusive or violent conduct by a parent may produce a home environment that endangers a child's well-being. *In re J.I.T.P.*, 99 S.W.3d 841, 845 (Tex. App.—Houston [14th Dist.] 2003, no pet.).

A parent's pattern of drug abuse will also support a finding of conduct endangering a child even if there is no evidence that such drug use actually injured the child. *Vasquez v. Tex. Dep't of Protective & Regulatory Servs.*, 190 S.W.3d 189, 196 (Tex. App.—Houston [1st Dist.] 2005, pet. denied). A history of illegal drug use and drug-related criminal activity is conduct that subjects a child to a life that is

15

uncertain and unstable, endangering the child's physical and emotional well-being. *In re S.D.*, 980 S.W.2d 758, 763 (Tex. App.—San Antonio 1998, pet. denied); *Dupree v. Tex. Dep't of Protective & Regulatory Servs.*, 907 S.W.2d 81, 84 (Tex. App.—Dallas 1995, no writ); *see also In re S.R.*, 452 S.W.3d 351, 361-62 (Tex. App.—Houston [14th Dist.] 2014, pet. denied) (parent's drug use may qualify as a voluntary, deliberate, and conscious course of conduct endangering the child's well-being); *Walker v. Tex. Dep't of Family & Protective Servs.*, 312 S.W.3d 608, 617 (Tex. App.—Houston [1st Dist.] 2009, pet. denied) (illegal drug use may support termination under subsection E because it "exposes the child to the possibility that the parent may be impaired or imprisoned[]"). A parent's continued drug use when the custody of his or her child is in jeopardy supports a finding of endangerment. *See In re S.R.*, 452 S.W.3d at 361-62 (citing *Cervantes-Peterson v. Tex. Dep't of Family & Protective Servs.*, 221 S.W.3d 244, 253-54 (Tex. App.—Houston [1st Dist.] 2006, no pet.) (en banc)). A parent's drug use, incarcerations, incidents of domestic violence, criminal history, and employment and housing instability prior to and during the case create a course of conduct from which a factfinder could determine the parent endangered the child's emotional and physical well-being. *See In re M.C.*, No. 09-18-00436-CV, 2019 Tex. App. LEXIS 2961, at **15-16 (Tex. App.—Beaumont Apr. 11, 2019, no pet.) (mem. op.); *see also In re D.O.*, 338 S.W.3d 29,

16

36-37 (Tex. App.—Eastland 2011, no pet.); *In re V.V.*, 349 S.W.3d 548, 553-54 (Tex. App.—Houston [1st Dist.] 2010, pet. denied).

Predicate Findings Under Section 161.001(b)(1)(D) and (E)

In their first issue, Mother and Father challenge the sufficiency of the evidence to support the trial court's finding under subsection D of section 161.001(b)(1) of the Texas Family Code. In their second issue, Mother and Father challenge the sufficiency of the evidence to support the trial court's findings under subsection E of section 161.001(b)(1) of the Texas Family Code. Specifically, they argue there was no evidence of domestic violence provided at trial, Mother and Father completed the Department's requested drug treatment program, and there was no evidence of drug abuse within five months of trial. Mother and Father assert that "[t]he trial court erred as it was misled by the Department as to the extent of the conflict within the home as well as the lack [of] ongoing drug abuse by the parents." Appellants make the same arguments in challenging the sufficiency of the evidence supporting a finding under section E as they do in challenging the sufficiency of the evidence supporting a finding under section D and argued that the completion of the court-ordered substance abuse program is not a "course of conduct" of endangerment.

17

According to the parents, the caseworker offered testimony regarding the drug testing but "[n]o background was given related to the worker's experience, training, or expertise related to drug testing, interpreting results, or making inferences or conclusions about testing." Mother and Father assert that the caseworker's testimony that Mother's and Father's drug use occurred throughout the case was a "misrepresentation to the court[,]" because Father's most recent positive drug test—a hair follicle test from June 2019—could detect drug use up to ninety days prior, which means that Father could have last used drugs five months prior to trial. According to Appellants, there was no evidence offered at trial that the parents were regular users of illegal substances before the case was initiated, and it appears the drug use stopped approximately five months prior to trial. Mother and Father also argue that the evidence showed that the parents routinely would get into arguments that result in a neighbor calling the police, but that the police reports the caseworker testified about do not demonstrate that either parent was charged with a crime or ever convicted of a crime. Appellants contend that the Department offered no evidence that P.M. was ever in the same room as or aware of the verbal arguments.

The trial court heard Brenda Lara, the caseworker for P.M., testify that before the Department got involved, Mother drove under the influence of alcohol with P.M. in the vehicle on two occasions, and that Mother had also left the infant child

18

unattended while she went to a store approximately a mile away. Lara testified to multiple instances of law enforcement being called to Mother's and Father's home regarding disturbances caused by their arguing, and that as a result of one of the instances when police noted wounds to Father after Mother assaulted Father, a protective order was issued against Mother. Mother was also arrested for public intoxication in October 2018. According to Lara, even in the couple of months prior to trial "[t]here are still call outs to [Mother's and Father's] home" for disturbances. The trial court heard Lara's testimony that she had concerns regarding Mother's and Father's ability to protect P.M. The trial court heard Lara's testimony that, although they had completed their service plan, Mother and Father were "unsuccessfully discharged" by their first outpatient counselor for not showing up, they continued to test positive for cocaine during the pendency of the case, Mother consistently denied having a drug problem despite testing positive for cocaine on a urine test as recent as April 2019 (approximately eight months after the Department filed its petition) when she knew she was pregnant and putting her unborn baby's health at risk, Mother and Father did not engage in services until P.M. had been in the Department's custody at least six months, Mother did not start modifying her behavior until she was on probation for violating the protective order and under threat from the criminal court system, Father tested positive for cocaine in June 2019

which indicated drug use at least through March 2019 (approximately seven months after the Department filed its petition), and Mother and Father continued to test positive for drugs despite the trial court's warning that their continued drug abuse could result in termination or restriction of their parental rights. The law enforcement records, protective order, and drug test results were admitted into evidence without objection, and Appellants had the opportunity to cross-examine the caseworker regarding the records.

The trial court heard Lara's and the CASA's recommendations that Mother's and Father's parental rights as to P.M. should be terminated due to Mother's and Father's drug use, domestic violence, and relationship instability that could threaten P.M.'s safety and ability to thrive in a safe and stable environment. The trial court heard the CASA's testimony that she was concerned about Mother's and Father's behavior throughout the case, and that she believed Mother and Father had not shown progress and were "checking the boxes, not making real changes."

Deferring to the trial court's credibility determinations and reviewing all the evidence in the light most favorable to the termination findings under subsections D and E, the trial court could have reasonably formed a firm belief or conviction that Mother and Father, through their individual acts and omissions or through a course of conduct, endangered P.M.'s physical or emotional well-being. We conclude the

20

Department established, by clear and convincing evidence, that Mother and Father committed the predicate acts enumerated in subsections D and E. *See* Tex. Fam. Code Ann. § 161.001(b)(1)(D), (E). Further, considering the entire record, we conclude that even the disputed evidence is not so significant that the court could not reasonably have formed a firm belief or conviction that Mother and Father endangered P.M. *See In re J.F.C.*, 96 S.W.3d at 266.

Having concluded that the evidence is legally and factually sufficient to support the trial court's findings of endangerment under subsections D and E as to both Mother and Father, we overrule Mother's and Father's issues. Neither Mother nor Father challenge the trial court's finding that termination was in the child's best interest. We affirm the trial court's judgment.

AFFIRMED.

_____
LEANNE JOHNSON
Justice

Submitted on December 10, 2019
Opinion Delivered February 20, 2020

Before Kreger, Horton and Johnson, JJ.

21